**NATIONAL INDEMNITY CO. OF OMAHA**

v.

**AMERICAN NAT. BANK OF SAINT PAUL et al.**

Civ. No. 2422.

United States District Court
D. Minnesota, Third Division.

Feb. 25, 1954.

As Amended April 30, 1954.

Irvin E. Schermer and Sheldon Gensler, Minneapolis, Minn., for plaintiff.

James H. Geraghty and Milton H. Altman (of Lipschultz, Altman & Geraghty), St. Paul, Minn., for American Nat. Bank of St. Paul.

Charles Weyl, St. Paul, Minn., for Fidelity & Casualty Co. of New York.

DONOVAN, District Judge.

Plaintiff brings this action for an accounting, and will be referred to herein as "plaintiff". In the order set forth in the title of the case, defendants will hereafter be referred to as "the Bank", "Fidelity", "Auch" and "Agency, Inc.", respectively.

By separate answers the Bank counterclaimed against plaintiff. Fidelity pleaded assignment of the Bank's claims against Auch and Agency, Inc., in the sum of $71,338.94, and set up cross-claims against the last two defendants in said sum. Auch and Agency, Inc., made no answer and are in default. Plaintiff's motion to dismiss as to Fidelity was granted. Fidelity's motion for findings and judgment against Auch and Agency, Inc., in said sum was granted.

There is no serious dispute as to the facts. For a number of years prior to the time here concerned with, Auch had been in the insurance business and duly licensed for that purpose. In October, 1952, he caused Auch Agency to be incorporated for the purpose of carrying on said business. Plaintiff and Auch had entered into an agreement pursuant to which Auch and his successor, Agency, Inc., solicited and sold insurance and collected premiums in connection therewith, such premiums to be remitted to plaintiff and like insurers as required. In plaintiff's case premiums, less commissions, were to be forwarded to plaintiff within forty days from the end of the month in which such insurance became effective, as

covered by the statements of account and as provided by agreement.[1]

Auch and Agency, Inc., maintained but one general checking account with the Bank into which income and premiums were indiscriminately deposited. From this account remittances were made to plaintiff and operating expenses were met by checks issued from the same account.

Upon application made by Auch, the Bank's Loan Committee recommended extension of credit to Auch in the sum of $100,000. A rule requiring the borrower to deposit customers' money directly in the collection account was adopted and consistent therewith the Bank would not accept any Auch checks drawn on his Agency account in payment of notes executed by him. The Bank relied upon the sufficiency of collateral furnished by Auch in the form of deferred premium finance contracts. On the strength of the foregoing, loans were made.

In March of 1952 Auch began to default in the payment of customers' monies into the premium collection account, and as provided by the premium finance contracts. As a result, officers of the Bank called on him in September, 1952, to make inquiry and check the matter. An understanding of reassurance was undoubtedly had at that time.

A recital of all that followed is unnecessary. A few illustrations will suffice. On November 6, 1952, Auch drew a check on his Agency account for $19,000 to cover payments of $12,000 and $7,000 due on notes secured by said collateral. The Bank concedes this violated the rule referred to. Other payments were made under like circumstances. In February, 1953, there was due Auch from Kelley-Haas Agency the sum of $27,450.50 for insurance premiums written by the latter agency for plaintiff during December, 1952, and January, 1953, and Auch simultaneously with the receipt of this payment issued two more checks to the Bank in the sums of $7,000 and $9,013.34, and on March 3, 1953, said checks were charged to the account here concerned with.

It is undisputed that Auch mingled premiums collected in his business with his private funds in his Agency account. He testified that he intended to adhere to the Agency contract of June 1, 1951. Checks drawn by him payable to National Indemnity Company were on check stationery which merely said "Charles T. Auch Agency." Plaintiff's witnesses Ringwalt, Liesche and Wortz testified that in the insurance industry the companies did not require agents to maintain a separate bank account for each company the agent represented, and that the common practice was for the agent to maintain a general premium account into which he put the premiums of the various companies and from which remittances for the premiums were disbursed. They stated that they did not sanction commingling of the funds, but had no knowledge that this was being done. They testified that it was not customary in the industry for agents to designate the nature of the account on the face of the check drawn in disbursement of the

1. In this respect the Agency was required to account to plaintiff as follows:

"All moneys paid by the policyholders to the agent, or to anyone representing him, shall be held by and chargeable to the agent as a fiduciary trust for and on behalf of the Company, and shall be paid over to the Company as hereinafter provided * * *

"The agent agrees to pay to the Company all premiums accruing on insurance written under this agreement, whether or not collected by the agent from the assured * * * and guarantees to the Company earned premium on any such risks bound, whether collected or not.

"The agent shall furnish to the company monthly, by the tenth day of the succeeding month (or at its option the Company may furnish to the agent) a statement of account covering transactions for each month, and the agent shall remit to the Company the net amount shown by such statement to be due the Company within forty days after the close of the month covered by said statement. * * * Above statements and remittances are to be sent to the Company at Ringwalt and Liesche, Agency, 532 Brandeis Theatre Building, Omaha, Nebraska."

premiums, and that until March 19 or 20, 1953, they had no reason to suspect that there was a mingling.

During the latter part of February and the forepart of March, 1953, the Bank first disturbed by Auch's manipulations, later became suspicious of him, and as a result of an inquiry discovered that most of the collateral consisted of forged instruments. The Bank thereupon exercised its right of set off, in the face of a garnishment by plaintiff, and appropriated the entire balance of said account in the sum of $8,390.98. Subsequent to March 20, 1953, Auch continued to make deposits of National Indemnity Company premiums into his Agency account to the extent of $2,761.02. Subsequent to March 20, 1953, the Bank again returned five checks drawn by Auch on his Agency account payable to the order of National Indemnity Company, giving as a reason that the account had been closed.

On May 6, 1953, the Auch account was closed. The monies withdrawn by reason of the off sets of March 12, 1953, and March 23, 1953, had been credited by the Bank to the Charles T. Auch collection account. On June 25, 1953, the Bank applied $10,256.60 to the outstanding Charles T. Auch notes and interest thereon. The balance of the off set in the amount of $3,859.34 remained as surplus funds in the hands of the Bank. Plaintiff instituted suit for an accounting, claiming that the insurance premiums collected by Auch and Agency, Inc., were trust funds, and the property of the plaintiff.

Plaintiff contends that the insurance premiums collected by an agent become a trust fund, thereby creating a trust relationship as opposed to a debtor-creditor relationship. Plaintiff maintains that this is so even if the Bank had no knowledge of the source of the funds.

Defendant Bank contends that the general account in question was subject to its right under the terms of said promissory notes, to offset the balances in said accounts against the indebtedness due said Bank from the maker of said notes.[2]

The first issue to consider in the instant case is whether the funds deposited in the defendant Bank by Auch and Agency, Inc., constituted money held in trust for plaintiff. In other words, do the facts warrant the conclusion that the Bank had actual or constructive knowledge of the trust character of the funds, as contended herein by plaintiff?

■ Opposing the claim of plaintiff, the Bank urges that the conduct of the general account in question both by the depositor and the Bank discloses a situation opposed to the character of a trust.[3] However, if the Bank knew that premiums were being deposited in the account, then it must be held to know that the account was, at the very least, in part a trust account and to have been put on notice that the monies it appropriated were to that extent a trust account.[4]

2. The Bank contends that the sole issue in the case is whether plaintiff brings itself within the rule stated in Berg v. Union State Bank, 1930, 179 Minn. 191, 229 N.W. 102, 103, which rule is stated as follows:

"* * * if the bank has notice or knowledge of the true ownership of the fund, or if it has knowledge of facts and circumstances sufficient to require inquiry on its part, which inquiry, if made, would have disclosed the true ownership, it cannot apply the fund to an individual indebtedness owing to it by the agent or trustee depositing the same. * * *

"* * * a bank, even though it has no express or implied knowledge of the true ownership of the fund deposited in his own name by a trustee or agent, cannot apply such fund to the individual debt of such trustee or agent, where the lack of knowledge has not resulted in any detrimental change in the bank's position and no superior equities have arisen in its favor."

3. Defendant Bank cites in support of this, Mannheimer v. Phinney, 174 Minn. 504, 219 N.W. 765. The facts of the instant case distinguish it from the Mannheimer case.

4. Western Assur. Co. v. Genesee Valley Trust Co., 2 Cir., 171 F.2d 664, 666. In this case, cited by the Bank, Judge Frank, speaking for the Court, said:

There can be no serious dispute but that the Bank knew at all times since the account was established that it was partially made up of premiums collected for and belonging to the plaintiff. In support of this, the Bank's officer testified as follows:

"Q. And you were aware that Auch had been depositing premiums collected on National Indemnity Company policies in that particular account and drawing checks on that account? A. Yes, I was aware of that.

"Q. And that was true during the entire period, was it not? A. That is correct.

"Q. You recognized that there was an agency relation throughout that entire period between the National Indemnity Company and Mr. Auch, did you not? A. I assumed that there was an agency relation between them inasmuch as he was writing their policies.

"Q. And you knew then that these premiums which he collected did belong to National Indemnity Company, isn't that correct? A. I would assume that they did.

"Q. As a matter of fact, you knew that all during this period, isn't that correct?—or you assumed so, let's put it. A. I assumed that the premiums that he had collected on policies sold for the National Indemnity Company were premiums that belonged to the National Indemnity Company. There was never any question about that.

"The bank apparently had no actual knowledge of the trust; it evidently relied on the Agency's apparent ownership. But if the bank knew that premiums were being deposited in the account, then, charged with knowledge of § 125, it must be held to know that the account was in part a trust account and to have been put on notice that the deposit balance which it appropriated was a trust account."

5. Twin City Fire Insurance Company v. Green, 8 Cir., 176 F.2d 532; Robertson

"Q. And that was true the entire period of time? A. That is correct."

The questions and answers above quoted make clear that defendant Bank had knowledge as distinguished from mere suspicion, and was aware that the deposit was a trust fund. This knowledge permits of no presumption to the contrary and upon which the Bank could safely rely.[5]

■ The facts in this case bring it within the law clearly enunciated and set forth in the cases cited in footnote 5, which in effect hold that where an agent deposits trust funds in his own name in a bank and the bank has express or implied notice of the trust character of such funds, the bank is estopped from appropriating and applying such funds to the individual indebtedness owing it by said agent.

The second issue involved in the instant case is the matter of accounting for the trust funds, or the tracing of them. The evidence on this aspect of the case is far from satisfactory.

It is admitted that Auch and Agency, Inc., commingled the trust funds of plaintiff with funds due other agencies. From this one general account as noted, supra, remittances were made, not only to plaintiff, but also to other insurance agencies. It is from this one general fund that the Bank received and appropriated monies to apply on the individual indebtedness owing it by Auch. Such procedure by the Bank was wrongful, but the cogent question in this case is whether the plaintiff has earmarked its money by probative evidence in the record.[6]

v. Malone, 5 Cir., 190 F.2d 756, 759; American Surety Co. v. Greenwald, 223 Minn. 37, 25 N.W.2d 681; Agard v. Peoples Nat. Bank, 169 Minn. 438, 211 N. W. 825, 50 A.L.R. 629; Berg v. Union State Bank, 179 Minn. 191, 229 N.W. 102; Rodgers v. Bankers' Nat. Bank, 179 Minn. 197, 229 N.W. 90; Central National Bank v. Connecticut Mutual Life Ins. Co., 104 U.S. 54, 26 L.Ed. 693. Union Stock Yards Bank v. Gillespie, 137 U. S. 411, 11 S.Ct. 118, 34 L.Ed. 724.

6. 6 Dunell's Minnesota Digest, § 9876.

Plaintiff contends it is entitled to recover four specific lump sums. Apparently the evidence, insofar as tracing any funds due to the plaintiff is concerned, must be limited as outlined in plaintiff's case.

■ Plaintiff contends it is entitled to recover premiums of the plaintiff deposited by Auch subsequent to March 20, 1953, totalling $2,761.42. The evidence shows that on March 20, 1953, plaintiff notified defendant Bank that Auch was depositing its premiums in his account. Plaintiff maintains that where the Bank has full notice of the trust character of funds deposited with it in the agent's personal account, it is liable to the principal for the amount received.[7] This amount is allowed plaintiff as proved.

■■ Plaintiff contends it is entitled to recover the amount of $8,390.98 representing funds appropriated by the Bank on March 12, 1953, which sum plaintiff maintains to have been the "lowest intermediate balance." Under the ruling of the Berg case, supra, the Bank could not apply this fund to the individual debt of the trustee or agent (in this case Auch's indebtedness). This does not mean, however, that the plaintiff is entitled to this sum. As stated, supra, the plaintiff's evidence as to the accounting aspect of this case is very unsatisfactory. The general checking account maintained was comprised of funds due several agencies. The exhibits indicate many deposits and withdrawals over a period of time on a running account. The evidence would support a holding, however, that $1,481.-14 constituted trust funds belonging to plaintiff, and that amount is awarded to plaintiff.[8]

Plaintiff contends it is entitled to recover the amount of $3,042.33 appropriated by the Bank on March 23, 1953. This amount is allowed plaintiff as proved.

Plaintiff's largest claim, and the last one here considered, is for $16,013.34, representing the receipt by the Bank of trust funds on March 3, 1953. The evidence on this claim from the plaintiff's standpoint is as follows:

On February 25, 1953, the bank balance in the Agency account was $9,350.29. The Kelley-Haas check for $27,457.50 was deposited on February 26, 1953, as part of a total deposit of $28,482.04, so on that date the balance in the Auch account was $36,932.28. Between February 26, 1953, and March 3, 1953, there was one deposit of $1,670.78. The checks totaling $16,013.34 were shown as withdrawals on March 3.

Of the $16,013.34 paid out, $10,374.83 (made up of $9,350.29 on hand and $1,-024.54 balance of deposit of February 26) could have been funds, as to the nature and source of which there is no evidence. The evidence would support a holding, however, that $5,638.51 was from the Kelley-Haas premiums, and that amount, therefore, is awarded to plaintiff.[9]

Plaintiff may submit findings of fact, conclusions of law, order for and form of judgment consistent with the foregoing.

Both parties may have exceptions.

---

7. In this connection plaintiff cites: Rodgers v. Bankers' Nat. Bank, supra [179 Minn. 197, 207, 229 N.W. 90]; First Nat. Bank of Chicago v. Newhouse, 7 Cir., 17 F.2d 228; Union Stock Yards Nat. Bank v. Moore, 8 Cir., 79 F. 705.

8. The owner of the trust fund who seeks to reclaim it has the burden of proving that his money, or other money or property into which his money was transmuted, is present in the estate. Schuyler v. Littlefield, 232 U.S. 707, 34 S.Ct. 466, 58 L.Ed. 806.

9. As a matter of dictum, it is difficult to understand, in view of the complex accounting problem presented in this case, why plaintiff did not make a thorough audit of the bank account, or why the litigants did not make the other interested companies parties to this suit as permitted by the Federal Rules of Civil Procedure, 28 U.S.C.A. While it is true that one who has knowledge it is receiving trust funds should not derive a direct advantage through diversion of trust funds, Aetna Casualty and Surety Company v. Catskill National Bank & Trust Co., 2 Cir., 102 F.2d 527, 530, it may well be that if plaintiff is out any additional money it will have to seek recovery thereof from the bankrupt estate.